## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## CIVIL CASE NO. 1:19-cv-00307-MR

| | | |
|---|---|---|
| **CHRISTOPHER GENE CRAWFORD,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **vs.** | ) ) | **MEMORANDUM OF DECISION AND ORDER** |
| **BRADLEY RICHARDS, et. al.,** | ) ) ) | |
| **Defendants.** | ) ) | |
| _____ | ) | |

**THIS MATTER** comes before the Court on Defendants' Motion for Summary Judgment [Doc. 36] and on Plaintiff's "'Motion on response to' Defendants Material Facts" [Doc. 43].

## I.     PROCEDURAL BACKGROUND

On October 25, 2019, Plaintiff Christopher Gene Crawford ("Plaintiff"), proceeding *pro se*, filed this action pursuant to 42 U.S.C. § 1983 for the violation of his civil rights during and after his trial at the Burke County Courthouse (the "Courthouse") in Morganton North Carolina. [Doc. 1]. He named the Burke's County Sheriff's Office ("Sheriff's Office") and the Burke County District Attorney's Office ("DA's Office") as Defendants. With his Complaint under § 1983, Plaintiff filed a separate complaint for negligence

against Wayne Clontz, his attorney; the Honorable Lisa Bell[1]; Michelle Ledford, the Assistant District Attorney for Burke County; and the Sheriff's Office and DA's Office. [Doc. 1-2 at 1-3]. For the purposes of initial review, the Court considered these complaints collectively as one complaint, treating Plaintiff's negligence complaint as simply stating a cause of action for negligence as if propounded in Plaintiff's § 1983 Complaint. [See Doc. 13 at 3].

Plaintiff alleged that he was on trial for a Class H Felony and that Judge Bell declared a mistrial and revoked Plaintiff's bond. [Doc. 1 at 2]. Plaintiff further alleged that the bailiffs in the courtroom then put him in handcuffs and took him to the hallways behind the courtroom, where they threw him to the ground, knocking out his tooth; kicked him, breaking two ribs; and broke his tailbone. [Id.].

The Court dismissed Defendants Burke County District Attorney's Office, Judge Bell, and Michelle Ledford with prejudice and Defendants Clontz and the Sheriff's Office without prejudice for the reasons stated in the Court's Order. [Doc. 13 at 4-6]. The Court, however, allowed Plaintiff to amend his complaint to identify the Sheriff's Office employee(s) responsible

---

[1] Plaintiff incorrectly identified Judge Bell as "Belle." [See Doc. 1-2 at 2-3]. The Court will hereinafter refer to Judge Bell by her correct name and will direct the Clerk to update the docket in this matter accordingly.

for the alleged use of excessive force outside the courtroom. [Id.].

Plaintiff timely amended his complaint. [Doc. 15]. In his Amended Complaint, Plaintiff identifies Defendants Bradley Richards and FNU Huffman[2] as the bailiffs who allegedly used excessive force on Plaintiff in the Courthouse. [Doc. 15 at 5; Doc. 15-1 at 6]. Plaintiff also asserted a new claim that, after he was beaten at the Courthouse, he was transported to the Burke Catawba District Confinement Facility (BCDCF), where Richards and Huffman continued the abuse and were joined by Defendants Josh Smith and FNU Sickjack,[3] whom Plaintiff identified as a Sergeant and Lieutenant at BCDCF, respectively. [Doc. 15-1 at 6]. Plaintiff's claims against Defendants Richards, Huffman, Siciak, and Smith survived initial review based on the use of excessive force[4,5] [Doc. 17] and are the only claims

---

[2] Defendant FNU Huffman has since been identified as Jonathan Huffman [see Doc. 38-4], and the Court will direct the Clerk to update the docket in this matter to reflect this Defendant's true name.

[3] Defendant "FNU Sickjack" has since been identified as Patricia Siciak [see Doc. 38-10], and the Court will also direct the Clerk to update the docket in this matter to reflect this Defendant's true name.

[4] Plaintiff named Defendants Richards, Huffman, and Siciak in their official capacities only. [Doc. 15 at 2-3]. Plaintiff did not specify the capacity in which he purports to sue Defendant Smith. [See Doc. 15-1 at 1]. The Court assumes, therefore, that Plaintiff intended to sue Smith in his individual and official capacities.

[5] Plaintiff also named Wayne Clontz, his attorney, and Bryan Jones as Defendants in the Amended Complaint. [Doc. 15-1 at 1]. The Court dismissed these Defendants on initial review of Plaintiff's Amended Complaint for the reasons stated in that Order. [Doc. 17].

remaining for disposition here.

On December 14, 2020, Defendants filed a Motion for Summary Judgment. [Doc. 36]. Defendants argue that summary judgment should be granted because Plaintiff failed to exhaust administrative remedies, because Plaintiff's claims fail as a matter of law, because Defendants did not use excessive force on Plaintiff, and because qualified immunity bars Plaintiff's claims against Defendants. [Id.].

Thereafter, the Court entered an order in accordance with Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the requirements for filing a response to the summary judgment motion and of the manner in which evidence could be submitted to the Court. [Doc. 40]. The Plaintiff was specifically advised that he "may not rely upon mere allegations or denials of allegations in his pleadings to defeat a summary judgment motion." [Id. at 2]. Rather, he must support his assertion that a fact is genuinely disputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." [Id. (citing Fed. R. Civ. P. 56(c)(1)(a))]. The Court further advised that:

> An affidavit is a written statement under oath; that is, a statement prepared in writing and sworn before a

notary public. An unsworn statement, made and signed under the penalty of perjury, may also be submitted. Affidavits or statements must be presented by Plaintiff to this Court no later than fourteen (14) days from the date of this Order and must be filed in duplicate.

[Id. at 3-4 (citing Fed. R. Civ. P. 56(c)(4))].

In response, Plaintiff filed an improper two-page letter directed to the undersigned that is not in the form of an affidavit or signed under penalty of perjury. [See Doc. 48]. The Fourth Circuit recently made clear that a district court is to consider verified prisoner complaints as affidavits on summary judgment "when the allegations contained therein are based on personal knowledge." Goodman v. Diggs, 986 F.3d 493, 498 (4th Cir. 2021).

In support of their summary judgment motion, Defendants have submitted a brief, numerous affidavits, various BCDCF records relating to Plaintiff, incident reports, and a Statement of Undisputed Material Facts. [Docs. 37, 38, 38-1 through 38-11, 39]. Plaintiff responded to Defendants' motion [Docs. 43, 43-1] but submitted nothing in a form acceptable at summary judgment.[6] And neither of Plaintiff's complaints were verified or

---

[6] In his response, Plaintiff submitted certain affidavits and other evidence submitted by Defendants, the Sheriff's Office Use of Force Policy, and what appear to be excerpts from Defendants' Answer, along with his assessment of these materials. [Docs. 43, 43-1]. Plaintiff also restated some factual allegations against Defendants. [See Doc. 43-1 at 32-34]. In his response, Plaintiff also moved to sue Defendants in their official and individual capacities. [Id. at 14]. Although improperly brought, the Court will construe Plaintiff's

otherwise submitted under penalty of perjury and, therefore, cannot be considered for their evidentiary value here.  See Goodman, 986 F.3d at 498-99.  Thus, in terms of evidentiary forecast, the Defendants' is unrefuted.

## II.    STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is material only if it might affect the outcome of the suit under governing law.  Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

---

motion as one to amend his Complaint, which the Court will deny as untimely.  [See Doc. 31].

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Rather, the nonmoving party must oppose a proper summary judgment motion with citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" in the record. See id.; Fed. R. Civ. P. 56(c)(1)(a). Courts "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Eastern Shore Mkt. Inc. v. J.D. Assoc.'s, LLP, 213 F.3d 174, 180 (4th Cir. 2000). The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. Facts, however, "must be viewed in the light most favorable to the nonmoving party only if there is a

'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380, 127

S.Ct. 1769, 1776 (2007).  As the Supreme Court has emphasized,

> "[w]hen the moving party has carried its burden under Rule 56(c), the opponent must do more than simply show there is some metaphysical doubt as to the material facts ….  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348 (1986) (footnote omitted).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-28, 106 S. Ct. 2505 (1986).  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.[7]

Scott, 550 U.S. at 380, 127 S.Ct. at 1776.

## III.    FACTUAL BACKGROUND

Defendants' uncontroverted forecast of evidence shows the following.

### A.    The Courtroom and Hallway

On March 27, 2019, Defendant Bradley Richards served as a bailiff

---

[7] As noted, Plaintiff has presented no evidence in a form acceptable at this stage of the proceedings.  Moreover, the story told by Plaintiff, in his complaints, is "blatantly contradicted by the record" such that "no reasonable jury could believe it."  The Court, therefore, would be unable to adopt Plaintiff's version for purposes of this motion, in any event.  See Scott, 550 U.S. at 380, 127 at 1769.

during Plaintiff's criminal trial in Courtroom #1 of the Burke County Courthouse. Other bailiffs on duty included including Deputies Matthew Randall, Shawn Annas, and Jeremy Penland. [Doc. 38-4 at ¶¶ 3, 6: Huffman Dec.; Doc. 38-1 at ¶ 4: Annas Dec.; Doc. 38-5 at ¶ 3: Norman Dec.; Doc. 36-6 at ¶ 5: Penland Dec.; Doc. 38-7 at ¶ 5: Randall Dec.]. Lieutenant Rodney Norman, who testified during the trial, was also present in the Courtroom. [Doc. 38-5 at ¶ 3: Norman Dec.]. Throughout the day, several Sheriff's Office deputies and officers observed Plaintiff fidgeting, shaking, acting strangely, and appearing anxious, excited, jittery, and agitated. [Doc. 38-4 at ¶ 5; Doc. 38-5 at ¶ 4; Doc. 38-7 at ¶ 5; <u>see</u> Doc. 38-8 at ¶ 4]. Officers also observed Plaintiff speaking loudly with his attorney, which was distracting for jurors. [Doc. 38-5 at ¶ 4; Doc. 38-7 at ¶ 6].

Judge Bell presided over the trial. She instructed the Plaintiff to stop being loud and verbal. [Doc. 38-7 at ¶ 6]. Plaintiff's attorney also asked Plaintiff to stop talking. [<u>Id.</u>]. Plaintiff continued to speak out loud and interrupt witnesses. [<u>Id.</u> at ¶ 7]. Judge Bell warned Plaintiff that she would declare a mistrial if he continued this behavior. [<u>Id.</u>]. Despite this warning, Plaintiff continued until Judge Bell took a recess, declared a mistrial, requested additional bailiffs, and placed Plaintiff in the custody of the Sheriff's Office. [Doc. 38-5 at ¶¶ 4-5; Doc. 38-7 at ¶¶ 7-8; Doc. 38-1 at ¶ 5;

Doc. 38-6 at ¶ 6].  Thereafter, Plaintiff became aggravated and erratic, and began to cry and scream, "Josh Lives!"  [Doc. 38-5 at ¶ 5; Doc. 38-4 at ¶ 7; Doc. 38-7 at ¶ 9; Doc. 38-8 at ¶ 6; Doc. 38-1 at ¶ 6; Doc. 38-6 at ¶ 6]. Defendant Huffman escorted Plaintiff out of the Courtroom and into the hallway with the assistance of Deputies Randall and Penland.  [Doc. 38-6 at ¶ 7; Doc. 38-7 at ¶ 9].  Plaintiff continued to yell loudly enough such that Lieutenant Norman, who was still inside the Courtroom, had to come out to the hallway to assist the deputies who were escorting Plaintiff to the Bailiff's Office.  [Doc. 38-5 at ¶ 6].

Deputy Annas remained behind in the Courtroom but could hear what was being said in the hallway.  [Doc. 38-1 at ¶ 8].  He heard a male voice say, "Turn around and face the wall and put your hands behind your back." [Id.].  Plaintiff actively resisted and screamed at the deputies that they should speak to Judge Bell about changing her decision.  [Doc. 38-5 at ¶ 7; Doc. 38-4 at ¶ 8; Doc. 38-6 at ¶ 9].  Defendant Huffman handcuffed Plaintiff and attempted to perform a pat down, but Plaintiff leaned against the wall, slid to his knees, and claimed that he could not walk because he was "going to shit [him]self."  [Doc. 38-4 at ¶¶ 9-11; Doc. 38-5 at ¶ 7; Doc. 38-7 at ¶ 9; Doc 38-8 at ¶ 7; Doc. 38-6 at ¶ 9].  Plaintiff continued to resist and began screaming phrases, such as "Josh Lives!," "I am shitting myself," "I have bad guts," and

"I didn't buy my kids Christmas presents." [Doc. 38-8 at ¶ 8; Doc. 38-1 at ¶ 9].

Defendant Huffman, along with Deputy Randall, picked up Plaintiff off his knees and escorted him to the Bailiff's Office while Deputy Richards followed. [Doc. 38-4 at ¶ 12; Doc. 38-7 at ¶ 10]. Plaintiff resisted, went limp, refused to walk freely, and attempted to slow them down. [Doc. 38-7 at ¶ 10; Doc. 38-6 at ¶ 10]. Lieutenant Norman instructed the deputies to use their verbal commands and to ensure that such commands were loud enough for Plaintiff and others to hear. [Doc. 38-5 at ¶ 7].

At some point, Defendant Richards noticed that Plaintiff was about to spit on Deputy Randall. [Doc. 38-8 at ¶10; Doc. 38-7 at ¶ 11]. Defendant Richards turned Plaintiff's head forward to prevent him from spitting on Deputy Randall. [Doc. 38-8 at ¶ 11; Doc. 38-7 at ¶ 11]. Plaintiff continued to resist transport, voluntarily went to the floor, and proceeded to kick and scream that he was defecating himself and had gastrointestinal issues. [Doc. 38-7 at ¶ 12; Doc. 38-8 at ¶ 12]. Defendant Huffman lifted Plaintiff from the floor and carried him to the Bailiff's Office. [Doc. 38-7 at ¶ 14; Doc. 38-8 at ¶ 12].

Lieutenant Norman walked with the deputies and Plaintiff until they reached the Bailiff's Office and ensured the deputies were giving good

commands and following proper protocol. [Doc. 38-6 at ¶ 8; Doc. 38-7 at ¶ 13]. At this point, the deputies placed Plaintiff in a chair, and Plaintiff stated, "I can't breathe." [Doc. 38-7 at ¶ 13]. Lieutenant Norman observed that Plaintiff was upset and hyperventilating and instructed the deputies to loosen Plaintiff's tie and/or unbutton his shirt. [Id.]. After this, Plaintiff said he was fine. [Id.]. While Plaintiff was still sitting in the chair, Defendants Huffman and Richards placed Plaintiff in restraints. [Doc. 38-4 at ¶ 14].

Lieutenant Norman then complimented the deputies for the way they handled the situation and returned to the courtroom, as did Deputy Randall. [Doc. 38-5 at ¶ 9; Doc. 38-4 at ¶ 13; Doc. 38-7 at ¶ 15]. Norman later called Sheriff's Office Captain Greg Huntley to inform him how well the deputies handled the situation. [Doc. 38-5 at ¶ 9]. At no time did any deputy or other individual use unnecessary or excessive force on Plaintiff. [Doc. 38-7 at ¶ 15; Doc. 38-5 at ¶ 9; Doc. 38-6 at ¶ 11]. Any minimal force used during this incident was merely a response to Plaintiff's resistance to being escorted to the Bailiff's Office. [Doc. 38-7 at ¶ 16]. After placing Plaintiff in restraints, Defendants Huffman and Richards escorted Plaintiff down the back stairwell into the transport car. [Doc. 38-4 at ¶¶ 15-16].

## B.    Transport to BCDCF

On the way to BCDCF, Plaintiff sat in the back seat of the transport car

with his head hung down.  [Doc. 38-4 at ¶ 17].  He appeared to be passed out, asleep, or potentially under the influence of an intoxicating substance. [Doc. 38-4 at ¶ 17; Doc. 38-8 at ¶¶ 13-14].  Defendant Richards had to wake him up.  [Doc. 38-8 at ¶ 13].  During transport, Defendant Richards called the BCDCF to inform them how agitated Plaintiff had appeared.  [Id. at ¶ 14]. Defendant Huffman kept a close eye on Plaintiff's respirations during the entire transport.  [Id.].  When asked whether he was okay, Plaintiff would mumble something in response.  [Doc. 38-4 at ¶ 13].

### C.    Intake and Placement in Padded Cell at BCDCF

Upon arrival at the BCDCF, a detention officer assisted Plaintiff out of the transport car and into the facility for intake procedures.  [Doc. 38-4 at ¶ 18].  At this point, the Sheriff's Office no longer had custody of Plaintiff.  [Id.]. Although Plaintiff was no longer in the custody of the Sheriff's Office, Defendants Huffman and Richards followed BCDCF officers as they placed Plaintiff in a padded cell.  [Id. at ¶ 19; Doc. 38-8 at ¶ 15].  Defendants Huffman and Richards removed Plaintiff's restraints, as well as his clothes, to ensure he had not defecated himself.  [Id.].  Defendant Siciak was working at BCDCF on March 27, 2019 when Plaintiff was brought there.  [Doc. 38-10 at ¶ 4: Siciak Dec.].  Defendant Siciak does not remember Plaintiff's arrival that day, but she is familiar with Plaintiff from previous occasions when he was

held at BCDCF.  [Id.].

Standard procedure at BCDCF in March of 2019 called for inmates who appeared inebriated, were violent or uncooperative, were suicidal as determined by medical staff, or who otherwise needed observation to be housed in padded cells.  [See Doc. 38-10 at ¶ 7].  It was also standard procedure, when placing inmates in padded cells, to remove the inmate's clothing and place them in a green safety smock commonly referred to as a "turtle suit."  [Id. at ¶ 8; see Doc. 38-11 at ¶ 10: Smith Dec.].  At BCDCF, padded cell checks were to be done every 15 minutes.  Plaintiff was checked on every 15 minutes, as indicated on the Daily Report of Inmate.  [Doc. 38-10 at ¶ 11 & pp. 8-9].

### D.    No Evidence of Injury

Intake procedure at BCDCF included searching inmates before their restraints were removed, looking them over for apparent injuries, asking them personal and medical questions to assess whether additional medical attention is needed, and reviewing the personal property form with them. [Doc. 38-11 at ¶ 6].  Defendant Smith, a detention officer at BCDCF, was working when Plaintiff arrived at BCDCF on March 27, 2019.  Defendant Smith was involved in Plaintiff's intake.  [Id. at ¶¶ 4-5].  Plaintiff's intake forms show that he had no visible injuries, no breathing difficulties, and that he did

not report any serious medical needs.  [Doc. 38-11 at ¶ 6 & p. 8].  The intake

form also states that Plaintiff was not bleeding or complaining of pain.  [Id. at

8].

When an incoming inmate needed medical attention on arrival, as

deemed necessary by medical staff, the inmate would be transported to the

hospital for evaluation.  [Doc. 38-10 at ¶ 6; Doc. 38-11 at ¶ 9].  Had Plaintiff

needed medical attention at intake, Defendant Smith would have ensured

that Plaintiff was taken to a facility for treatment.  [Doc. 38-11 at ¶ 12].

In a BCDCF "Intake/Sick-Call Record" dated March 28, 2019, a nurse

reported that "[s]taff states he was held in contempt of court yesterday; they

suspect illicit substance abuse."  [Doc. 38-10 at 6].  A medical examination

of Plaintiff was performed, which was normal, and "NO injury [was] reported."

[Id.].  Had Plaintiff reported any injuries or the need for medical attention, or

had BCDCF medical staff observed any injuries, he would have been further

evaluated and treated as appropriate.  [Id. at ¶ 13].

### E.    Grievance Procedure and Exhaustion

In March 2019 and otherwise, BCDCF had an internal grievance

process available to all inmates.  [Doc. 38-10 at ¶ 14].  All inmates, including

Plaintiff, had the opportunity to file a grievance at any time about any subject.

Upon request, inmates were provided with grievance forms to use in

submitting grievances.  The grievance forms were reviewed by a supervisor and BCDCF would attempt to resolve the grievance.  All inmates had multiple opportunities to participate in the grievance process and would be afforded the opportunity to speak with any officer of any rank if they desired to do so. [Id.].  Plaintiff never filed a grievance at BCDCF.  [Id.].  Had Plaintiff asked to file a grievance, he would have been given unimpeded access to participate in the grievance process.  [Id.]. After BCDCF, Plaintiff was transferred to the Caldwell County Jail.  [Doc. 15 at 7].  Plaintiff also never filed any grievances at Caldwell County Jail regarding the instant incident, BCDCF, any of the Defendants here, or otherwise.  [Doc. 38-9 at ¶¶ 7-8: Shook Dec.].

## IV.    DISCUSSION

### A.    Failure to Exhaust Administrative Remedies

The Defendants argue that the Plaintiff failed to exhaust his administrative remedies prior to filing this action and, therefore, that his claims against Defendants Siciak and Smith related to the events allegedly occurring at BCDCF should be dismissed pursuant to the Prison Litigation Reform Act ("PLRA").  [Doc. 39 at 14-15 (citing 42 U.S.C. § 1997e(a))].

The PLRA states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until

such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). In <u>Jones v. Bock</u>, 549 U.S. 199 (2007), the Supreme Court stated that "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." <u>Id.</u> at 211 (citing <u>Porter</u>, 534 U.S. at 524). The Supreme Court has highlighted that the exhaustion of administrative remedies must occur before a civil action is commenced. <u>Porter v. Nussle</u>, 534 U.S. 516 (2002). For example, a prisoner may not exhaust his administrative remedies during the pendency of a Section 1983 action. <u>See</u> <u>Germain v. Shearin</u>, 653 Fed. Appx. 231, 234 (4th Cir. 2016); <u>French v. Warden</u>, 442 Fed. App'x 845, 846 (4th Cir. 2011). In <u>Anderson v. XYZ Correctional Health Servs.</u>, 407 F.3d 674 (4th Cir. 2005), the Fourth Circuit determined that:

> [A]n inmate's failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by the defendant. That exhaustion is an affirmative defense, however, does not preclude the district court from dismissing a complaint where the failure to exhaust is apparent from the face of the complaint, nor does it preclude the district court from inquiring on its own motion into whether the inmate exhausted all administrative remedies.

<u>Id.</u> at 683. Exhaustion is excused "if a prisoner, through no fault of his own, was prevented from availing himself of it." <u>Moore</u>, 517 F.3d at 725. Futility, however, is no exception to the exhaustion requirement. <u>Reynolds v. Doe</u>,

431 Fed. App'x 221, 222 (4th Cir. 2011) (citing <u>Booth v. Churner</u>, 532 U.S. 731, 741 n. 6 (2001)).  Nor is an inmate's ignorance of the requirement. <u>Goodwin v. Beasley</u>, 2011 WL 835937, *3 (M.D.N.C. Mar. 3, 2011) ("Courts have squarely rejected prisoners' attempts to bypass the exhaustion requirements by merely arguing lack of knowledge about the grievance process."); <u>Smith v. Boyd</u>, 2008 WL 2763841, *1 (D.S.C. July 11, 2008) ("This court cannot waive the exhaustion requirement, which was specifically mandated by Congress, based on Plaintiff's ignorance of the requirement or any perceived futility or inadequacy with the administrative grievance process.").

Here, the uncontroverted forecast of evidence shows that Plaintiff did not file a written grievance.  He did not file any grievance at the BCDCF or at Caldwell County Jail.  Plaintiff alleged in his Complaint that he filed a grievance at Caldwell County Jail [Doc. 15 at 7], but Plaintiff concedes that it did not relate to his instant claims.  Moreover, he has presented no forecast of evidence of such a grievance, whether related or not.  Specifically, Plaintiff offered no evidence to rebut Defendants' showing that Plaintiff failed to exhaust his administrative remedies before filing this lawsuit.  Plaintiff did not even address the issue of exhaustion in his summary judgment response.

Moreover, in his original Complaint, Plaintiff admitted that he had not sought "relief from the appropriate administrative officials regarding the acts complained of." [Doc. 1 at 3]. Plaintiff filed an administrative remedies statement shortly after his Complaint in which he tacitly acknowledged not having exhausted his administrative remedies based on his belief that he did not "have administrative remedies available at this time." [Doc. 5]. In his Amended Complaint, Plaintiff acknowledged not having filed a grievance "in the jail, prison, or other correctional facility" where his claims arose but claimed to have filed a grievance at Caldwell County Jail. [Doc. 15 at 7]. Plaintiff, however, admits that his claim in that grievance related not to the instant matters but to "how [he] was being held without bond on a Class H Felony and it being unconstitutional and how [he] was filing a Habeas Corpus." [Id.].

Plaintiff, therefore, has not presented a sufficient forecast of evidence to survive the Defendants' Motion for Summary Judgment as to Plaintiff's claims against Defendants Siciak and Smith, which allegedly occurred at the BCDCF. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (the plaintiff can survive a motion for summary judgment by providing sufficient evidence so that "a reasonable jury could return a verdict for [the plaintiff].") Accordingly, Defendants Smith and Siciak's Motion for Summary Judgment

will be granted on this ground. Because dismissals based on the failure to exhaust administrative remedies are without prejudice, the Court addresses the other grounds for summary judgment asserted by all Defendants, including Smith and Siciak. See Dillard v. Anderson, No. 2:13-CV-31-FDW, 2010 WL 9553022, at *2 n.2 (W.D.N.C. Sept. 6, 2010) (Whitney, C.J.). ("A dismissal for failure to exhaust administrative remedies is without prejudice.").

## B.    Use of Excessive Force

The Fourteenth Amendment "protects a pretrial detainee from the use of excessive force that amounts to punishment." Graham v. Connor, 490 U.S. 386, 395 n.10 (1989). To state an excessive force claim, a pretrial detainee must show only that the force "purposely or knowingly used against him was objectively unreasonable." Kingsley v. Hendrickson, 576 U.S. 389 (2015). The standard for assessing a pretrial detainee's excessive force claim is "solely an objective one." Id. In determining whether the force was objectively unreasonable, a court considers the evidence "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." Id. (citing Graham, 490 U.S. at 396). Considerations that bear on the reasonableness or unreasonableness of the force include: the relationship between the need for

the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. Id.

Claims by a § 1983 plaintiff against law enforcement in their official capacities are claims against the entity of which an officer is an agent. Kentucky v. Graham, 105 S.Ct. 3099 (1985) (citing Monell v. New York City Dep't of Soc. Servs., 436 658, 690, n. 55, 98 S.Ct.2018, 2035, n. 55 (1978)). To succeed on the merits of such a case, the plaintiff must prove that an unconstitutional policy, practice, or custom of the entity "played a part" in the claimed constitutional violation. Id. (citations omitted).

Plaintiff has sued Defendants Richards, Huffman, and Siciak in their official capacities only. [Doc. 15 at 2-3]. Plaintiff's claims against these Defendants, therefore, survive only if the forecast of evidence shows that BCDCF and Sheriff's Office policies, customs, or practices played a part in any constitutional violations. Plaintiff, however, has presented no such forecast of evidence. Plaintiff has alleged a use of excessive force, but he has presented no evidence of such. Likewise, he has neither alleged nor presented a forecast of evidence that any use of excessive force was the result of any custom, policy, or practice. As such, there is no genuine issue

of material fact remaining for trial and the Court will grant these Defendants' motion for summary judgment on this ground.

Moreover, even if Plaintiff had asserted individual capacity excessive force claims against these Defendants, they would fail, as does his claim against Defendant Smith. The uncontroverted evidence before the Court demonstrates that the force used on Plaintiff was reasonable and well within constitutional limits. At the Courthouse, Plaintiff actively resisted movement to the Bailiff's Office after Judge Bell declared a mistrial. Plaintiff repeatedly and voluntarily fell to the floor, screamed nonsensically at the deputies, and attempted to spit on Deputy Randall. Any minimal force that was used on Plaintiff to lift him upright and to avert his head from spitting on Deputy Randall was necessary and objectively reasonable under the circumstances created by Plaintiff. Furthermore, the intake of Plaintiff at BCDCF was in keeping with their appropriate standard procedures. There is no forecast of any evidence of the use of force, let alone excessive force, at BCDCF by any Defendant or otherwise. As such, there is no genuine issue of material fact as to Plaintiff's excessive force claim, and it will be also dismissed on those grounds.

## C.  Qualified Immunity

"Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful."  Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).  "To determine whether an officer is entitled to qualified immunity, the court must examine (1) whether the plaintiff has demonstrated that the officer violated a constitutional right and (2) whether that right was clearly established at the time of the alleged violation."  E.W. ex rel. T.W. v. Dolgos, 884 F.3d 172, 178 (4th Cir. 2018) (internal quotation marks omitted).  The doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law."  Smith v. Ray, 781 F.3d 95, 100 (4th Cir. 2015) (internal quotation marks omitted).

Here, because Plaintiff has not presented a forecast of evidence that Defendants violated a constitutional right, Defendant Smith is entitled to qualified immunity on Plaintiff's individual capacity claim against him.  To the extent Plaintiff intended to assert individual capacity claims against Defendants Huffman, Richards, and Siciak, these Defendants are also

entitled to qualified immunity. As such, summary judgment for Defendants would also be proper for Defendants on this ground.

## V. CONCLUSION

For the reasons stated herein, the Court will grant Defendants' motion for summary judgment.

## O R D E R

**IT IS, THEREFORE, ORDERED** that the Defendants' Motion for Summary Judgment [Doc. 36] is **GRANTED** and this action is hereby **DISMISSED with prejudice**.

**IT IS FURTHER ORDERED** that Plaintiff's "'Motion in responses to' Defendants Material Facts" [Doc. 43] is **DENIED**.

The Clerk is respectfully instructed to update the docket in this matter to reflect Defendant FNU Huffman's true full name as Jonathan Huffman; Defendant FNU Siciak's true full name as Patricia Siciack; and Defendant Lisa Belle's name as Lisa Bell.

The Clerk is instructed to terminate this action.

**IT IS SO ORDERED**.

Signed: June 7, 2021

Martin Reidinger
Chief United States District Judge